**John Harvey ADAMSON,
Petitioner-Appellant,**

v.

**James G. RICKETTS, Director, Arizona Department of Corrections, et al., Respondents-Appellees.**

No. 84–2069.

United States Court of Appeals, Ninth Circuit.

Argued En Banc and Submitted Sept. 17, 1985.

Decided May 9, 1986.

---

Timothy J. Foley, San Francisco, Cal., Timothy K. Ford, Seattle, Wash., for petitioner-appellant.

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Jack Roberts, Asst. Atty. Gen., Phoenix, Ariz., for respondents-appellees.

Before KENNEDY, HUG, SCHROEDER, PREGERSON, ALARCON, FERGUSON, NELSON, BOOCHEVER, NORRIS, BEEZER, and BRUNETTI, Circuit Judges.

FERGUSON, Circuit Judge:

Petitioner filed a petition for a writ of habeas corpus in the District Court of Arizona after exhausting all his state remedies. He contends that his conviction for first degree murder and death sentence violated various provisions of the federal Constitution. The district court denied his petition, and a panel of this court affirmed that denial, *Adamson v. Ricketts*, 758 F.2d 441 (9th Cir.1985). That decision was vacated when the majority of the judges of the circuit voted to have the appeal determined by an en banc panel. We reverse the district court and direct the issuance of a writ of habeas corpus.

### I.

Petitioner Adamson was arrested and charged with the 1976 car bombing murder of Don Bolles, an investigative reporter in Arizona. In January 1977 Adamson and the state entered into a plea agreement[1] under which Adamson would testify against two other individuals and plead guilty to second degree murder. In exchange, Adamson would receive a sentence of 48–49 years imprisonment, with actual incarceration time to be 20 years, 2 months.

On January 15, 1977, Superior Court Judge Ben Birdsall reviewed the plea agreement, but conditioned his acceptance of its provisions until he determined the appropriateness of the sentence. Four days later, Judge Birdsall found the sentence appropriate and accepted the guilty plea and plea agreement provisions.

After the court's acceptance of the plea agreement, for the next three years Adamson cooperated with authorities. On the basis of Adamson's testimony, Max Dunlap and James Robison were convicted of the first degree murder of Bolles. While the Dunlap and Robison convictions were pending on appeal, the state moved to have Adamson's sentence imposed. Judge Birdsall sentenced Adamson to the agreed term of 48–49 years on December 7, 1978.

On February 25, 1980, the Arizona Supreme Court reversed the convictions of Max Dunlap and James Robison and remanded the cases for new trials. *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980); *State v. Robison*, 125 Ariz. 107, 608 P.2d 44 (1980). When the state sought to secure Adamson's testimony in the retrials, Adamson's lawyer stated that his client believed that the plea agreement terminated his obligations once he was sentenced. He further stated that Adamson requested additional consideration, including release, in exchange for his testimony at the retrials.[2] The state, in a letter to Adamson's attorneys dated April 9, 1980, stated that it considered Adamson to have breached the plea agreement by refusing to testify and that Adamson would be prosecuted for first degree murder.[3]

A few days later, the state called Adamson as a witness at a pretrial hearing in the Dunlap and Robison retrials. Adamson reconfirmed his previous testimony concern-

---

1. The text of the plea agreement appears in Appendix A.

2. The letter sent by Adamson's attorney included the following terms for Adamson's future testimony: (1) release from custody after testifying; (2) to be held in a non-jail facility with full-time protection during the retrials; (3) a complete set of clothing; (4) protection for his ex-wife and son; (5) an educational fund for his

son; (6) transportation and funds for establishing a new identity outside of Arizona; and (7) full and complete immunity for all crimes in which he may have been involved, stipulating that none were murders. The full text of the letter is contained in Appendix B.

3. The text of the state's letter is contained in Appendix C.

ing the Bolles killing but asserted a Fifth Amendment privilege when questioned about another crime. After examining the state's letter of April 9, 1980, Superior Court Judge Robert L. Myers denied the state's motion to compel Adamson to testify. Judge Myers concluded that Adamson could legitimately assert his Fifth Admendment rights unless the state granted him immunity from prosecution. Although the state sought review of Judge Myers' denial of the motion to compel Adamson to testify, the Arizona Supreme Court declined to accept jurisdiction of the Special Action Petition. *Adamson v. Superior Court*, 125 Ariz. 579, 582, 611 P.2d 932, 935 (1980) (en banc).

The state filed a new information charging Adamson with first degree murder, *id.*, which he challenged by a Special Action in the Arizona Supreme Court, *id.* at 579, 611 P.2d at 933. The court held that Adamson, by refusing to testify, breached the plea agreement and that he waived the defense of double jeopardy. *Id.* at 584, 611 P.2d at 937. The court vacated Adamson's second degree murder sentence, judgment of conviction, and guilty plea, and reinstated the open murder charge. Following that decision, Adamson offered to accept the state's interpretation of the agreement and to testify against Dunlap and Robison. The state refused Adamson's offer and proceeded with the charge of first degree murder.

Adamson unsuccessfully sought federal habeas corpus review pursuant to 28 U.S.C. § 2254, and this court affirmed in an unpublished memorandum disposition the district court's denial of the petition. *Adamson v. Hill*, 667 F.2d 1030 (9th Cir.1981). On October 17, 1980, Adamson was convicted of first degree murder. At sentencing, in accordance with the Arizona statute, Ariz.Rev.Stat.Ann. § 13–703(C), Judge Birdsall concluded that two aggravating circumstances—(1) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of

anything of pecuniary value, and (2) the defendant committed the offense in an especially heinous, cruel or depraved manner—were present to invoke a death sentence. The Arizona Supreme Court affirmed. *State v. Adamson*, 136 Ariz. 250, 665 P.2d 972, *cert. denied*, 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983). The petitioner then instituted the present federal habeas corpus proceeding.

The issues before this court are (1) whether the admission of certain evidence at trial violated the Confrontation Clause; (2) whether the Arizona statute denied the petitioner's right to a jury trial by permitting judicial factfinding to determine eligibility for a death sentence; (3) whether the Arizona statute's aggravating factor of heinous, cruel or depraved manner is unconstitutionally vague; (4) whether the imposition of a death sentence following Adamson's assertion of his Fifth Amendment rights constitutes prosecutorial or judicial vindictiveness;[4] (5) whether the Arizona statute violates the Eighth Amendment by requiring a death sentence if aggravating circumstances are present; and (6) whether prosecution for first degree murder after Adamson's guilty plea and conviction for second degree murder violated the prohibition against double jeopardy. Because the state's actions violated the Double Jeopardy Clause, we do not discuss or decide the validity of the remaining issues.

## II.

The Double Jeopardy Clause, which applies to state proceedings, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause incorporates three separate guarantees: "It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments

---

4. The dissenting opinion contends that in this case there was no prosecutorial or judicial vindictiveness. As we have declined to address the validity of that issue, we express no opinion about the position taken by the dissent.

for the same offense." *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 306–07, 104 S.Ct. 1805, 1812–13, 80 L.Ed.2d 311 (1984) (citing *Illinois v. Vitale*, 447 U.S. 410, 415, 100 S.Ct. 2260, 2264, 65 L.Ed.2d 228 (1980)); *see United States v. Brooklier*, 637 F.2d 620, 621 (9th Cir.), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1514, 67 L.Ed.2d 815 (1980).

Implicit in the prohibition against prosecution for the same offense following conviction is the "constitutional policy of finality for the defendant's benefit." *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971) (plurality opinion); *see also United States v. Scott*, 437 U.S. 82, 92, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978) ("primary purpose of the Double Jeopardy Clause was to protect the integrity of a final judgment"). Without this respect for finality, prosecutors, equipped with substantially greater resources than most individuals, would be permitted and encouraged to reprosecute defendants when the result was any sentence short of the maximum penalty. *See United States v. Dinitz*, 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976) ("Underlying this constitutional safeguard is the belief that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' ") (quoting *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957)).

■ For a defendant to invoke the double jeopardy bar against a subsequent prosecution, jeopardy must have attached to the first prosecution. When the defendant forgoes the right to have guilt determined by the trier of fact and instead pleads guilty to the charged offense, under some circumstances jeopardy attaches when the judge accepts the plea. *See, e.g., United States v. Vaughan*, 715 F.2d 1373, 1378 n. 2 (9th Cir.1983); *United States v. Bullock*, 579 F.2d 1116, 1118 (8th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978).

Here it appears that the plea was accepted subject to certain conditions. We need not decide whether jeopardy attached upon such an acceptance, *see United States v. Cruz*, 709 F.2d 111, 114–15 (1st Cir.1983), because, in any event, jeopardy attached to the prosecution for second degree murder when Judge Birdsall entered a judgment of conviction and sentenced Adamson on December 7, 1978.

■ Double jeopardy prohibits multiple prosecutions for the same offense. As a general rule, a conviction for a lesser-included offense bars the subsequent prosecution for the greater offense. *Illinois v. Vitale*, 447 U.S. 410, 419–21, 100 S.Ct. 2260, 2266–68, 65 L.Ed.2d 228 (1980); *United States v. Stearns*, 707 F.2d 391, 393 (9th Cir.1983), *cert. denied*, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 181 (1984). The Supreme Court, in *Brown v. Ohio*, 432 U.S. 161, 168, 97 S.Ct. 2221, 2226–27, 53 L.Ed.2d 187 (1977), determined that a conviction for joyriding barred the subsequent prosecution for the greater offense of auto theft because the "greater offense is ... by definition the 'same' for purposes of double jeopardy as any lesser offense included in it." *See also Garrett v. United States*, —— U.S. ——, 105 S.Ct. 2407, 2416, 85 L.Ed.2d 764 (1985) (*Brown* defendant "engaged in a single course of conduct"). To analyze this issue we must determine whether each offense "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *see also Vitale*, 447 U.S. at 416–17, 100 S.Ct. at 2265–66.

■ The state argues that Adamson was not subject to double jeopardy because his first conviction was for second degree murder and his second conviction was for first degree murder. If accepted, this reasoning would vitiate any protection guaranteed by the Double Jeopardy Clause. As with *Brown*, Adamson's second degree murder conviction was a lesser-included offense of

first degree murder. A conviction for second degree murder requires no fact that is not also needed to sustain a first degree murder conviction. Furthermore, the State of Arizona even recognizes this relationship by classifying the two types of murder as different degrees of the same crime. *See* Ariz.Rev.Stat.Ann. § 13–452, *repealed by* Laws 1977, ch. 142, § 15, effective October 1, 1978. Thus, Adamson's double jeopardy rights were violated by the subsequent prosecution for first degree murder.

## III.

■ The Arizona Supreme Court agreed that jeopardy attached to the second degree murder prosecution, *Adamson v. Superior Court*, 125 Ariz. 579, 584, 611 P.2d 932, 937 (1980), but it vacated Adamson's conviction and sentence because it believed that he had waived his double jeopardy rights by the plea agreement. We need not resolve whether a defendant may waive double jeopardy rights in the same manner as other constitutional rights because we conclude that, even if double jeopardy protection is waivable, it was not waived in this case.

" '[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights and ... 'do not presume acquiescence in the loss of fundamental rights.' " *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (quoting *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811–12, 81 L.Ed. 1177 (1937), and *Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292, 307, 57 S.Ct. 724, 731–32, 81 L.Ed. 1093 (1937)). Before finding that a defendant has waived a right, a court must be convinced that there was " 'an intentional relinquishment or abandonment of a known right or privilege.' " *United States v. Anderson*, 514 F.2d 583, 586 (7th Cir.1975) (quoting *Zerbst*, 304 U.S. at 464, 58 S.Ct.at 1023). In situations involving other constitutional rights, we have required a finding that the defendant's waiver was "made voluntarily, knowingly and intelligently." *United States v. Cochran*, 770 F.2d 850, 851 (9th Cir.1985) (waiver of right to jury trial). Furthermore, given the importance of the right, such waiver must be made expressly, rather than implied by conduct. *Cf. Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam) (will not imply waiver of double jeopardy rights from guilty plea in second prosecution); *Launius v. United States*, 575 F.2d 770 (9th Cir.1978).

■ The state maintains that Adamson waived the double jeopardy protection when he signed the agreement. It urges this court to adopt the Arizona Supreme Court's conclusion that the plea agreement "by its very terms waives double jeopardy if ... [it] is violated." *Adamson v. Superior Court of Arizona*, 125 Ariz. 579, 584, 611 P.2d 932, 937 (1980).[5] To support this

5. The Arizona Supreme Court relied on the text of the agreement and a statement by Adamson's attorney at the time of sentencing in which Adamson's attorney acknowledged that his client understood that he might have to testify at a future proceeding. The dissent likewise relies on the attorney's statement as evidence that Adamson knew that his obligations continued after sentencing.

The uncontroverted explanation of this "understanding" is that it involved a wholly separate prosecution. Simply because Adamson might have modified his obligations under the plea agreement to include testifying in the *Ashford Plumbing Co.* trial after his sentencing, this modification cannot be used as "evidence" that he knew he had to testify further against Dunlap and Robison. Moreover, even if the reference were to the possible Dunlap and Robison re-

trials, an attorney's actions cannot constitute a waiver of his or her client's protection against double jeopardy. *See United States v. Rich*, 589 F.2d 1025, 1032 (10th Cir.1978) ("Inasmuch as this right is anchored to the United States Constitution, it cannot be waived by one other then [sic] the accused.").

The Arizona Supreme Court's finding of a waiver does not preclude this court's own inquiry into that issue. Whether Adamson's actions constituted a waiver of a constitutional right is determined by federal law. *Gladden v. Unsworth*, 396 F.2d 373, 376 (9th Cir.1968). In a habeas review a federal court must presume the correctness of a state appellate court's finding of fact unless one of the seven circumstances provided for in 28 U.S.C. § 2254(d) is present or if the state court finding of fact is not fairly supported by the record and the federal court

conclusion, the state argues that Adamson impliedly waived his double jeopardy claim by accepting paragraphs five and fifteen of the plea agreement. Paragraph five outlines Adamson's obligation to testify and provides that if he refused, "this entire agreement is null and void and the original charges will be automatically reinstated." Paragraph fifteen provides that if "this agreement becomes null and void, then the parties shall be returned to the positions they were in before this agreement."

The state's contention that these paragraphs constitute a knowing waiver of double jeopardy is without merit. It may well be argued that the only manner in which Adamson could have made an intentional relinquishment of a known double jeopardy right would be by waiver "spread on the record" of the court after an adequate explanation. *See Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1968). Even if we were to permit a waiver by implication, the more reasonable interpretation of the agreement is that double jeopardy was not waived. The agreement contains several express waivers of constitutional rights, including the right to a jury trial, to confront and cross-examine witnesses against him, to present a defense, to have appointed counsel, to remain silent, and to be presumed innocent until proved guilty beyond a reasonable doubt. Although each of these waivers is specified in the agreement, double jeopardy is not mentioned. Furthermore, when reviewing the plea agreement, Judge Birdsall questioned Adamson at length about his waiver of the constitutional rights enumerated in the document, but did not inquire about any waiver of double jeopardy claims.

The plea agreement provides in paragraph five that "should the defendant refuse to testify ... then this entire agreement is null and void and the original charges will be automatically reinstated." Nothing in the agreement specifies that Adamson waived any defenses he had to those charges, including the constitutional defense of double jeopardy. Agreeing that charges may be reinstituted under certain circumstances is not equivalent to agreeing that if they are reinstituted a double jeopardy defense is waived. No evidence has been presented that suggests Adamson knew he was waiving his double jeopardy defense to the reinstituted charge. The plain language of the plea agreement merely provided that under certain circumstances the charges could be reinstituted.

Even if we assume, as the state contends, that the plea agreement contained an implied waiver of double jeopardy rights, the most that could be found implied in the plea agreement is that if Adamson did, or refused to do, something in the future, his action or inaction would constitute a waiver of his double jeopardy rights. But to meet the test of a knowing, intentional waiver there would have to be an action or inaction that Adamson knew would constitute a waiver. Simple contractual principles are ill-suited to determine whether there has been a waiver of a vital constitutional right. The state argues, in

---

provides a written explanation for its conclusion. *Sumner v. Mata*, 455 U.S. 591, 592–93, 102 S.Ct. 1303, 1304–05, 71 L.Ed.2d 480 (1982) (per curiam).

Section 2254(d), however, applies only to questions of " 'basic, primary, or historical fac[t].' " *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) ). When the issue includes a mixed question of law and fact or questions of law, section 2254(d) does not require giving a presumption of correctness to the state court's findings. *See Fendler v. Goldsmith*, 728 F.2d 1181, 1190 n. 21 (9th Cir.1984).

This case presents a mixed question of law and facts. Section 2254(d) applies to "historical" facts, such as whether Adamson signed the agreement, but it does not apply to whether his actions constituted waiver of double jeopardy. *See Sumner v. Mata*, 455 U.S. at 597, 102 S.Ct. at 1306–07 (questions of fact governed by section 2254(d), but reviewing court may accord "different weight to the facts"); *Fendler v. Goldsmith*, 728 F.2d at 1190 n. 21. *Cf. Miller v. Fenton*, ––– U.S. –––, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985) ("voluntariness of a confession is a matter for independent federal determination").

effect, that Adamson entered into a contract, and that implied in that contract was a provision that if it was ultimately determined that Adamson breached the contract, even though he did so unknowingly, the effect of the breach would be to waive his double jeopardy rights. Although unintentional breaches of contract can form the basis for damages in civil contract litigation, such principles are inappropriate to determine whether a defendant in a criminal action has knowingly and intentionally waived a constitutional right.

To constitute a knowing and intentional waiver of double jeopardy rights based on the breach of a plea agreement, the defendant's action constituting the breach must be taken with the knowledge that in so doing he waives his double jeopardy rights. Adamson's obligation to testify under the terms of the plea agreement was not clear and was reasonably subject to the interpretation that he and his attorney advanced. When there was a reasonable dispute as to Adamson's obligation to testify, there could be no knowing or intentional waiver until his obligation to testify was announced by the court. In this case, the superior court had upheld his refusal to testify and it was not until the Arizona Supreme Court ruling in *Adamson v. Superior Court*, 125 Ariz. 579, 611 P.2d 932 (1980), that it was judicially determined that he was obligated under the plea agreement to testify. Immediately thereafter, Adamson agreed to do so.

Adamson reasonably believed that a refusal to testify did not constitute a breach of the agreement. The only unambiguous language in the agreement referring to when his obligation to testify terminated appears in paragraph eight. That paragraph provides that sentencing would occur "at the conclusion of his testimony in all of the cases." Logic and common sense support Adamson's position that when the state moved for sentencing, it acknowledged that his obligation to provide further testimony ended. The other provisions of the agreement support this interpretation. The state explicitly provided for two obligations that would continue past sentencing—Adamson's waiver of early parole and

his waiver of an appeal. The obligation to testify could quite reasonably be interpreted to terminate at the time of sentencing.

Even if Adamson was obligated to testify after sentencing, it was reasonable for him to believe that his assertion of his Fifth Amendment rights at the Robison and Dunlap pretrial hearings did not violate the agreement. At oral argument, the state admitted that Adamson's attorney's letter listing the additional demands in exchange for his testimony was not a breach of the agreement. Rather, it was Adamson's assertion of his interpretation of the agreement. Adamson's refusal to testify at the Dunlap and Robison pretrial hearings was in direct response to the state's letter purporting to withdraw the protection of the plea agreement. It was reasonable for him to believe that the state's position vitiated his obligation to testify. Furthermore, Judge Myers upheld the validity of his Fifth Amendment assertion, and the Arizona Supreme Court refused to hear the state's appeal.

We fail to see how advancing one's interpretation of a plea agreement without more constitutes a knowing and voluntary waiver of double jeopardy. A defendant has the right to assert a reasonable construction of an agreement that differs from the state's interpretation. Otherwise, prosecutors would force defendants into accepting their interpretation. Adamson's position is a reasonable reading of the agreement. The defendant, faced with the state's letter asserting that he was no longer protected from prosecution, could hardly be expected to forgo the constitutional protection against self-incrimination, especially when the Arizona Supreme Court refused to reverse Judge Myers' decision.

■ Although the Arizona Supreme Court may have correctly decided under state law that Adamson breached the agreement, its vacation of the conviction and sentence did not remove the jeopardy that attached at Adamson's prior sentencing. The court relied on paragraph five's provision that Adamson's failure to testify

would nullify the agreement. By its express provisions, this clause could only result in voiding the executory agreement; it has no effect on the judgment of conviction and sentence.

The state argues that this literal interpretation of the plea agreement would make the bargain illusory. Such a claim ignores available options to ensure performance. Competent drafting of the agreement was certainly a method available to the state. The agreement could have addressed the waiver issue, specifically, whether a double jeopardy defense to a reinstated charge of first degree murder would be waived and what actions of Adamson would bring about the waiver. Even absent sufficient foresight and adequate drafting, the state would have avoided the entire problem by waiting until the Dunlap and Robison prosecutions were completed before having Adamson sentenced. The state offered no reason why Adamson had to be sentenced in December 1978. In fact, there was none. Both parties had waived the time for sentencing in paragraph eight. Finally, the state could have called Adamson to testify after he agreed to do so. The state claims this last option was inadequate because Adamson's credibility was diminished after his attorney submitted the list of additional requests. We are unpersuaded that a confessed murderer who has agreed to testify in return for a lesser punishment would have less credibility because his attorney made additional demands which were rejected by the state.

We conclude that jeopardy attached to the conviction for second degree murder and that Adamson did not knowingly and intelligently waive his double jeopardy protections.[6]

## IV.

The district court is directed to issue a writ of habeas corpus freeing the petitioner from the sentence and servitude of his conviction of first degree murder and the imposition of the death sentence.

■ The granting of the writ will not impair in any degree the conviction and sentence of the petitioner for the second degree murder based upon his plea agreement. The petitioner does not assert any invalidity in that sentence, and indeed he cannot as his claim of double jeopardy is based upon the fact that the second degree murder conviction is valid and enforceable. *See State v. Shaw*, 646 S.W.2d 52 (Mo.1983) (validity of first conviction unaffected by prohibiting second prosecution); *cf. Morris v. Mathews*, —— U.S. ——, 106 S.Ct. 1032, 1038–39, 89 L.Ed.2d 187 (1986) (appellate court permitted to reduce jeopardy-barred conviction to lesser-included offense that is not jeopardy-barred). Without such a valid conviction, there could be nothing upon which double jeopardy attaches.

The judgment of the district court denying the petition for writ of habeas corpus is reversed. The district court is directed to issue a writ of habeas corpus that frees the petitioner from the death penalty. The writ shall further provide for release of the defendant from all restraint caused by his conviction of first degree murder unless the Arizona Supreme Court, on or before six months from the date of the mandate in this appeal, reinstates the conviction for second degree murder that it previously

---

**6.** The dissent places great reliance on *Jeffers v. United States*, 432 U.S. 137, 153, 97 S.Ct. 2207, 2217–18, 53 L.Ed.2d 168 (1977), to dispose of Adamson's double jeopardy claims. At 729. Such reliance is misplaced. The Supreme Court in *Jeffers* held that "although a defendant is normally entitled to have charges on a greater and a lesser offense resolved in one proceeding, there is no violation of the Double Jeopardy Clause when he elects to have the two offenses tried separately and persuades the trial court to honor his election." 432 U.S. at 152, 97 S.Ct. at 2217.

Adamson, unlike Jeffers, never elected to have two offenses set forth in two separate indictments tried separately, nor did he persuade the trial court to honor his election, nor were there in fact two indictments and two trials. The *Jeffers* exception to *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), is inapplicable to the facts of this case.

vacated. *See Morris v. Mathews,* 106 S.Ct. at 1038–39.

REVERSED AND REMANDED.

APPENDIX A

*Terms of Plea Agreement*

1. The defendant, John Harvey Adamson, hereby agrees to plead guilty to Murder, Second Degree.

2. The statutory range of sentence for Murder, Second Degree, is probation if no sentence is imposed and ten (10) years to life if sentence is imposed.

3. The parties agree that the defendant shall receive a sentence of forty-eight (48) to forty-nine (49) years to date from June 13, 1976. The parties agree that the defendant shall be incarcerated for a total of twenty (20) calendar years and two (2) calendar months and that the sentence (48–49 years) when computed with statutory credits will not permit the defendant to complete the service of the maximum sentence of forty-nine (49) years until twenty (20) calendar years and two (2) calendar months have been passed. It is also agreed that the defendant will be incarcerated for no longer than twenty (20) years and two (2) months. Further the parties agree that the defendant will not apply for or be eligible for parole until twenty (20) calendar years and two (2) calendar months have passed. If the defendant applies for parole, the defendant agrees that this agreement is null and void and the original charges are reinstated automatically. The parties also agree that if for any reason the statutory time credits the defendant earns while incarcerated are taken away from him through no fault of his, including time spent in protective custody, whether requested by the defendant or ordered by the authorities, the sentencing Court will recompute the length of the sentence so that the defendant will not be incarcerated for any period longer than twenty (20) calendar years and two (2) calendar months.

4. The defendant hereby agrees to testify fully and completely in any Court, State or Federal, when requested by proper authorities against any and all parties involved in the murder of Don Bolles, and in the beating of Leslie Boros at the Sheraton-Scottsdale, Maricopa County, Arizona, and any and all parties involved in the crimes listed in Exhibits A and B filed with this Court as part of their agreement this date. The contents of the crimes and persons listed in Exhibits A and B shall remain sealed from public view until all of the individuals listed therein have been taken into custody or have had charges filed against them or until the State requests that the contents be made public.

5. It is agreed by all parties that the defendant shall testify truthfully and completely at all times, whether under oath or not, to the crimes mentioned in this agreement. This shall include all interviews, depositions, hearings and trials. Should the defendant refuse to testify or should he at any time testify untruthfully or if any material fact in the defendant's transcribed statements given to the State prior to this agreement be false, then this entire agreement is null and void and the original charge will be automatically reinstated. The defendant will be subject to the charge of Open Murder, and if found guilty of First Degree Murder, to the penalty of death or life imprisonment requiring mandatory twenty-five years actual incarceration, and the State shall be free to file any charges, not yet filed as of the date of this agreement.

6. The parties agree that the State will not prosecute the defendant for the following crimes: those he will testify to which are mentioned in this agreement and listed in Exhibits A and B, which are a part of this agreement; those where the defendant's involvement is presently known to the police and the subject of police reports; those which are material to the direct testimony of the defendant in relation to the crimes listed in this agreement and Exhibits A and B; those crimes which the defendant has revealed to the State in transcribed statements and those presently filed and now pending against the defendant. The pending cases against the defend-

ant in the Maricopa County Superior Court will be dismissed with prejudice at the time of sentencing. The defendant is to be severed in those cases from any other defendants.

7. The parties agree that the defendant will not testify to any of the matters referred to in this agreement until Judge Birdsall has accepted all the terms and conditions of this agreement.

8. All parties to this agreement hereby waive the time for sentencing and agree that the defendant will be sentenced at the conclusion of his testimony in all of the cases referred to in this agreement and Exhibits A and B, which accompany it.

9. The parties agree that in case of the resignation, death or incapacitating illness of the Judge assigned to this case, any Superior Court Judge assigned for that purpose by the Presiding Judge of Maricopa County may sentence the defendant in accordance with the terms of this agreement and is thereby bound by the terms of this agreement.

10. All parties agree that the sentencing of the defendant may be in any courthouse in any county seat or any other place designated by the sentencing Judge in the State of Arizona in accordance with Arizona Rules of Criminal Procedure and A.R.S. Sec. 12–130(C).

11. The parties agree that the defendant will not appeal from the judgment and sentence entered herein except as may be necessary to recompute his sentence to insure that he be incarcerated not longer than twenty (20) calendar years and two (2) calendar months. If the defendant appeals from this plea agreement except as noted herein, this plea agreement shall be null and void and all original charges are automatically reinstated.

12. It is understood by all parties at this time, and at all times in the past, that the only party with full authority to enter into any plea negotiations with the defendant herein has been William J. Schafer, III, of the office of the Arizona Attorney General, and that any offers alleged to have been tendered by any member of the office of the Maricopa County Attorney and specifically Donald W. Harris, were made without authority. It is specifically denied by counsel for the defendant that Donald W. Harris ever made any firm offer of ten (10) years actual incarceration to the defendant John Harvey Adamson in exchange for a plea of guilty.

13. The parties agree that any Federal immunity from prosecution will be in accord with the document filed by the U.S. Attorney with the Court this date.

14. The parties agree that the defendant will serve the agreed upon sentence in a prison outside the State of Arizona.

15. In the event this agreement becomes null and void, then the parties shall be returned to the positions they were in before this agreement.

16. That unless the plea is rejected or withdrawn, the defendant hereby gives up any and all motions, defenses, objections, or requests he has made or raised, or could assert hereafter, to or against the Court's entry of judgment and imposition of sentence upon him consistent with this agreement.

17. That the defendant understands the following rights and understands that he gives up such rights by pleading guilty:

a. His right to a jury trial;

b. His right to confront the witnesses against him and cross-examine them;

c. His right to present evidence and call witnesses in his defense, knowing that the State will compel such witnesses to appear and testify;

d. His right to be represented by counsel (appointed free of charge, if he cannot affort to hire his own) at the trial of the proceedings; and

e. His right to remain silent, to refuse to be a witness against himself, and to be presumed innocent until proven guilty beyond a reasonable doubt.

18. The defendant is to remain in the custody of the Pima County Sheriff from the date of the entry of his plea until the conclusion of his testimony in all of the

cases in which the defendant agrees to testify as a result of this agreement.

## APPENDIX B

*Letter dated April 3, 1980, from Petitioner's Attorney to Attorney General's Office*

Stanley L. Patchell, Esq.
Assistant Attorney General
Arizona State Capitol Building
Phoenix, Arizona 85007

Re: State of Arizona vs. John Harvey Adamson

Case No. CR–93385

Dear Stan:

I am writing to confirm our telephone conversation of April 2, 1980 wherein we discussed the availability of John Adamson for interviews in preparation for his testimony in the trials of the State of Arizona vs. James Robison and Max Dunlap.

As I advised you by phone, I have met with John Adamson at his place of incareration [sic] along with my law partner, Greg Martin. We had lengthy discussions revolving around his expected testimony as well as the plea agreement that he had entered into with the State of Arizona in the above-referenced case number. Further, at that time I also delivered to Mr. Adamson a complete set of transcripts of his testimony in the trial of James Robison and Max Dunlap that was previous held.

After lengthy discussions and consideration of all of the various aspects of this case and the potential ramifications to Mr. Adamson, I can advise you of the following matters:

1. John Harvey Adamson believes that he has fully complied with, and completed, his plea agreement entered into with the State of Arizona. It is, therefore, his position that his future testimony in any case involving the defendants Max Dunlap or James Robison regarding the killing of Donald Bolles will only be given upon the offer of further consideration by the State of Arizona.

2. John Harvey Adamson is well aware of the fact that he can be subpoenaed by your office to appear as a witness in any criminal matter; however, he is further aware that the fact that he may be called to the stand does not mean that he must testify. He does understand that he may be directly ordered by the Court to testify and, if he refuses do so, may be held in contempt by the Court.

3. John Harvey Adamson is further fully aware of the fact that your office may feel that he has not completed his obligations under the plea agreement in CR–93385 and, further, that your office may attempt to withdraw that plea agreement from him. He is aware that if the State were successful in doing so, that he may be prosecuted for the killing of Donald Bolles on a first degree murder charge.

4. If the State of Arizona desires to have Mr. Adamson testify in any further proceedings against James Robison or Max Dunlap, it is John Adamson's position that the following conditions must be met:

a. The State of Arizona will agree that, upon his completion of his testimony, John Harvey Adamson will be released from custody immediately. The testimony referred to herein is, of course, testimony in an additional trial of the State of Arizona vs. Max Dunlap and possibly, testimony in a separate trial of the State of Arizona vs. James Robison. If separate trials are held, Mr. Adamson's demand for his immediate release will apply to the completion of his testimony in whichever trial goes first. This demand is not to be considered to be contingent upon any verdict being reached in either case.

b. If the State agrees to the first condition, an additional condition will be that when John Harvey Adamson is transported to Maricopa County for his testimony in the above-referenced trial, that he will not be held in a facility of the Maricopa County Jail or the Maricopa County Sheriff's Department. It is his demand that he be held in a non-jail facility with the agreement that there will be full time, that being 24-hour, protection by some law enforce-

ment agency, preferably the U.S. Marshal's office, for Mr. Adamson's safety.

c. As a further and separate demand, John Harvey Adamson wishes to have a complete clothing outfit prior to his testimony in any trial consisting of a new suit, new shoes, socks, etc.

d. Mr. Adamson further demands that if his testimony is going to be requested by the State, his ex-wife Mary and his son be provided with protection until such time as Mr. Adamson is released from custody. Further, Mr. Adamson requests that an educational fund be set up for his son.

e. Mr. Adamson further demands that, upon his release from custody, he will be provided with suitable transportation and funds in order for him to travel to a location outside of the State of Arizona to set up a new identification and life for himself. It is anticipated that the State will work through the U.S. Attorney's office and the U.S. Marshal's office in an attempt to comply with this demand.

f. Further, John Harvey Adamson demands that, prior to any further testimony and/or interviews, he be provided with full and complete immunity for any and all crimes in which he may have been involved.

The above basically describes what Mr. Adamson's demands are for his future testimony in any case involving James Robison or Max Dunlap. As we have discussed many times in the past with Bill Schafer, the crimes for which John Adamson requires immunity in order to fully and completely answer any cross-examination by defense counsel, are not of such a nature that the State would be shocked for the State to extend immunity for those crimes. Further, I can represent that any immunity involved as far as any homicide case would be concerned would be an immunity from prosecution for any indirect, and unknowing, participation in any homicide.

By this letter, it is represented to you that John Harvey Adamson has not been directly involved in any actual homicide outside of the Don Bolles killing.

Again, I would like to re-emphasize the point that it is Mr. Adamson's position that he has fully and completely, and in good faith, fulfilled all of his obligations under the plea agreement. The plea agreement was drafted in such a manner that it was anticipated to be concluded prior to Mr. Adamson's sentencing. It is further our position that, without some type of stipulation, a Superior Court Judge will not have any jurisdiction to change, alter, or withdraw Mr. Adamson's plea agreemant and/or sentence.

I look forward to hearing from you in the near future.

Very truly yours,
MARTIN & FELDHACKER
s/ William H. Feldhacker
William H. Feldhacker

WHF:ir
CC/John Harvey Adamson

## APPENDIX C

*Letter dated April 9, 1980, from the Attorney General's Office*

Mr. William H. Feldhacker
Attorney at Law
1045 East Bethany Home Road
Phoenix, Arizona 85014

Re: JOHN HARVEY ADAMSON

Dear Mr. Feldhacker:

In regard to the requested testimony of John Harvey Adamson in the forthcoming retrial (or retrials) of Dunlap and Robison, the position of the state is as follows:

1. The January 15, 1977, plea agreement between the state and John Adamson is still in effect. Because of this the state has the right to call upon Mr. Adamson for testimony and for interviews.

2. On April 9, the state did call upon Mr. Adamson, through you, for an interview regarding his forthcoming testimony at the trial. As Mr. Adamson's attorney you refused to allow him to be interviewed.

3. Such a refusal by Mr. Adamson is a violation of the plea agreement. Because of such a refusal, the state may now institute proceedings necessary to carry into

effect those things noted in the plea agreement that result from a violation by Mr. Adamson. Specifically those things include: reinstatement of the first degree murder charge against Mr. Adamson for the murder of Don Bolles and its possible punishment of death; reinstatement of all other criminal charges that were dismissed pursuant to the plea agreement; withdrawal of the state's request of the federal government to assume custody of Mr. Adamson.

Mr. Adamson should also be aware that in addition to these things that flow directly from his breach of the plea agreement the state may also institute criminal actions that were not discussed as part of the plea agreement.

In an effort to resolve this question, a deposition of Mr. Adamson has been set by Judge French for 12:30 p.m. on April 10 in the conference room of the United States Attorney's Office at the Federal Building in Phoenix.

Sincerely,
ROBERT K. CORBIN
Attorney General
/s/ William J. Schafer, III
WILLIAM J. SCHAFER, III
Chief Counsel
Criminal Division

WJS/fn
0144F

BRUNETTI, Circuit Judge, with whom Circuit Judges KENNEDY, ALARCON and BEEZER join, dissenting:

Adamson has no valid double jeopardy defense to his prosecution for first degree murder, therefore I respectfully dissent.

1. *Background.*

John Harvey Adamson was charged with first degree murder in connection with the bombing death of Donald Bolles in Phoenix, Arizona. His first degree murder trial had commenced and was in the process of jury selection when Adamson and his attorneys struck a plea agreement with the district attorney whereby Adamson agreed to provide testimony against certain individuals, including James Robison and Max Dunlap, with regard to the murder of Donald Bolles, and to plead guilty to a charge of second degree murder. The plea agreement provided that Adamson would receive a sentence of 48–49 years imprisonment, with a maximum of 20 years, two months to be served, and that other charges pending against him would be dismissed.

The plea agreement was submitted to Arizona Superior Court Judge Birdsall for approval. At a formal hearing, the judge reviewed each detail of the plea agreement with Adamson, approved the agreement, and the first degree murder trial was suspended. The plea agreement provided for deferred sentencing; accordingly, the sentencing hearing was conducted without review of the details or consequences of the plea agreement.

2. *Adamson's Double Jeopardy Claim.*

A review of Adamson's double jeopardy claim [1] must acknowledge the "unique nature of the double jeopardy guarantee as compared to other constitutional rights." *United States v. Young,* 544 F.2d 415, 418 (9th Cir.), *cert. denied,* 429 U.S. 1024, 97 S.Ct. 643, 50 L.Ed.2d 626 (1976). A double jeopardy claim implicates the "very power of the State to bring a defendant into court," and thus is collateral to, and separable from, those constitutional claims which pertain to a determination of the principal issue at trial, i.e., whether or not the accused is guilty of the offense charged. *Abney v. United States,* 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977). Accordingly we have held that a plea of guilty to a charge brought in violation of the double jeopardy clause does not waive a double jeopardy defense. *Lau-*

---

[1] The double jeopardy issue was not raised by Adamson in the district court or his appeal from the district court, but was raised for the first time in this habeas corpus proceeding in appellant's Supplemental Brief on Rehearing En Banc. The double jeopardy defense had been previously rejected by this court in a prior habeas corpus proceeding. *See Adamson v. Hill,* 667 F.2d 1030 (9th Cir., 1983), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982).

*nius v. United States,* 575 F.2d 770, 771 (9th Cir.1978).

Whether a double jeopardy defense may be waived is a question this circuit has yet squarely to address. The Supreme Court has declined to hold that a double jeopardy claim may never be waived. *Menna v. New York,* 423 U.S. 61, 63 n. 2, 96 S.Ct. 241, 242 n. 2, 46 L.Ed.2d 195 (1975). The majority of sister circuits that have considered the question have concluded that a double jeopardy defense may be waived. *See, e.g., United States v. Broce,* 753 F.2d 811, 822 (10th Cir.1985) (double jeopardy claim may be waived by "an informed and intentional relinquishment specifically of ... rights under the Double Jeopardy Clause of the United States Constitution"); *Brown v. Maryland,* 618 F.2d 1057, 1058 (4th Cir.) (by pleading guilty after entering into a favorable plea bargain, defendant waived his right to be free from double jeopardy), *cert. denied,* 449 U.S. 878, 101 S.Ct. 224, 66 L.Ed.2d 100 (1980); *McClain v. Brown,* 587 F.2d 389, 391 (8th Cir.1978) (a bar to further prosecution because of former jeopardy is not a jurisdictional defect, but a defense or personal right which must be affirmatively pleaded or is considered waived); *United States v. Perez,* 565 F.2d 1227, 1232 (2d Cir.1977) (the constitutional immunity from double jeopardy is a personal right which, if not affirmatively pleaded by the defendant at the time of trial, will be regarded as waived); *United States v. Wild,* 551 F.2d 418, 424–25 (D.C.Cir.) (constitutional rights which the defendant may waive include the right not to be twice put in jeopardy), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226 (1977); *United States v. Buonomo,* 441 F.2d 922, 924 (7th Cir.) (constitutional immunity from double jeopardy is a personal right which if not affirmatively pleaded at trial will be regarded as waived), *cert. denied,* 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971).

Notwithstanding *Menna* and our decision in *Launius,* it is certain that the double jeopardy bar is not absolute. This is nowhere more apparent than in the context of a retrial following a mistrial. Where a mistrial has been declared without the defendant's request or consent, a new trial may take place so long as there existed a manifest necessity for the mistrial. *Illinois v. Somerville,* 410 U.S. 458, 461, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973). Similarly, "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution." *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971). This principle reaches its limits in permitting retrial following an unnecessary mistrial, declared without the defendant's request or express consent, if the defendant's statements or silences constitute an implied consent. *See United States v. Smith,* 621 F.2d 350, 351 (9th Cir.1980), *cert. denied,* 449 U.S. 1087, 101 S.Ct. 877, 66 L.Ed.2d 813 (1981).

The mistrial exceptions to the double jeopardy bar clearly refute the notion that the bar is absolute. The Supreme Court in *United States v. Dinitz,* 424 U.S. 600, 609 n. 11, 96 S.Ct. 1075, 1080–81 n. 11, 47 L.Ed.2d 267 (1976), has stated that a defendant's double jeopardy guarantee against multiple prosecutions may be *served* by a mistrial declaration, and that the permissibility of retrial in such cases does not depend on a waiver of the defendant's double jeopardy right. In certain cases a second prosecution may follow the midtrial dismissal of an indictment without running afoul of the double jeopardy clause. *See Lee v. United States,* 432 U.S. 23, 30, 97 S.Ct. 2141, 2145–46, 52 L.Ed.2d 80 (1977).

An exception to the double jeopardy bar pertinent to Adamson's case is described in *Jeffers v. United States,* 432 U.S. 137, 152, 97 S.Ct. 2207, 2217, 53 L.Ed.2d 168 (1977). In *Jeffers,* the defendant elected to be tried separately on greater and lesser included offenses. Although a subsequent trial on a greater offense following trial on a lesser included offense is, as a general rule, prohibited by the double jeopardy clause, *see Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the *Jeffers* Court found that the defendant's election deprived him of a double jeopardy defense to

the second trial. 432 U.S. at 152, 97 S.Ct. at 2217. The *Jeffers* Court did not speak of "waiver"; rather, the Court concluded that no violation of the double jeopardy clause had occurred. The second trial fell within an exception to the *Brown* rule, based on the defendant's role in bringing about the second trial.

This view of the double jeopardy clause was expanded and strengthened in *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), where the Court found permissible a second trial on two counts that had been dismissed in midtrial at the defendant's behest. The Court concluded that the policies underlying the double jeopardy clause do not extend "to include situations in which the defendant is responsible for the second prosecution." *Id.* at 96, 98 S.Ct. at 2196–97. Again the Court declined to adopt a "waiver" analysis, stating that "the double jeopardy clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice." *Id.* at 99, 98 S.Ct. at 2198.

3. *Adamson Knowingly Waived His Fifth Amendment Double Jeopardy Rights.*

There is no presumption of acquiescence in the loss of fundamental constitutional rights. The courts indulge in every reasonable presumption against waiver of fundamental constitutional rights. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. *Id.*

On January 15, 1977, Adamson and his three court-appointed attorneys appeared in open court before Arizona Superior Court Judge Birdsall. Judge Birdsall reviewed the plea agreement with Adamson paragraph by paragraph, and at times, word by word. Adamson intentionally waived his double jeopardy rights when he

accepted the totality of the plea agreement negotiated by his three attorneys. It is clear from the record that Adamson knew the circumstances confronting him and the consequences of entering into the plea agreement. Accordingly, his acceptance of the agreement constituted a waiver of all conflicting rights existing at that time.

The record shows the following: On January 15, 1977, Adamson was on trial as the defendant in Case No. CR 93385, Maricopa County, *State of Arizona v. John Harvey Adamson*, under a charge of open murder for the killing of Donald Bolles. On January 15, 1977, at a time set for continuing the voir dire examination of jurors in the case, the defense and the State of Arizona announced to the court that they had reached a plea agreement, and the document with two sealed exhibits, Exhibits A and B, were presented to the court. Exhibits A and B were referred to in, and were part of, the plea agreement. The exhibits were unsealed and Adamson signed each exhibit in open court whereupon the exhibits were replaced in their respective envelopes and sealed. The signatures of Adamson, his three attorneys and the two attorneys representing the State of Arizona were on the plea agreement.

The judge established that Adamson had four years of college education, never had any mental illness or disease, and was not under the influence of drugs or alcohol. Adamson acknowledged that his signature was on page 5 of the original plea agreement and that he had reviewed the agreement with all three of his counsel.[2] Judge Birdsall told Adamson that he initially plead not guilty to the charge that he murdered Donald Bolles on or about June 2, 1976 in Maricopa County, Arizona, and now by virtue of the plea agreement he was agreeing to plead guilty to murder in the second degree. Judge Birdsall reviewed the nature of murder in the second degree, and then in detail reviewed each paragraph

---

**2.** The judge asked "At this point do you believe you understand the provisions of the plea agreement?" Adamson answered "Entirely sir." The judge then asked Adamson "Do you have any questions that you want to ask me about before we go any further?" and Adamson answered "No sir." Transcript, Change of Plea, January 15, 1977, at 7.

of the plea agreement with Adamson, receiving acknowledgements from Adamson that he understood each plea agreement provision. Adamson acknowledged that he understood that by entering a guilty plea he was giving up his constitutional rights of a speedy public trial by a jury, (his trial being into the third week and in the process of jury selection), the confrontation of witnesses, the presentation of evidence on his own behalf, the right to compel attendance of witnesses, the right to be represented by counsel, and the right to remain silent.

Judge Birdsall reviewed paragraph 5 of the plea agreement with Adamson word for word.[3] He explained to him that one of the provisions of that paragraph was that should Adamson refuse to testify or at any time testify untruthfully concerning the crimes mentioned in the agreement, then the agreement would become null and void, and he would be subject to the charge of open murder. Adamson was told that if he was charged and found guilty of first degree murder, he would be subject to the penalty of death or life imprisonment requiring a mandatory twenty-five years of actual incarceration. Adamson stated that he understood what would happen if for any reason the agreement became null and void and the open murder charges were reinstated. As a result of understanding and agreeing to that provision, Adamson, with the advice of his attorneys, accepted

the totality of the plea agreement and the benefits derived therefrom in exchange for the rights and powers he had relinquished as set forth in the agreement. Each of the parties had now recast their legal status, and their respective rights and powers, into the terms of the integrated plea agreement which set forth their new rights and powers, including the enforcement provisions of paragraph 5.

At the conclusion of the plea agreement review Judge Birdsall read Adamson's, his attorneys' and the state prosecutors' acknowledgements of the agreement into the record.[4] All the parties confirmed their signatures and acknowledgements. Judge Birdsall then requested Adamson to establish a factual basis for his plea of guilty to the crime of murder in the second degree, whereupon Adamson related the facts of his participation in the killing of Donald Bolles. At this point Judge Birdsall confirmed that Adamson was satisfied with the legal representation of his three court appointed attorneys and that he had no complaints concerning the manner in which they had represented him as his attorneys.

The court deferred acceptance of the sentencing provisions in the plea agreement until it could receive and review a presentence report, and concluded by accepting the plea agreement and Adamson's plea to the charge of murder in the second degree.

---

3. Paragraph 5 of the plea agreement provides: It is agreed by all parties that the defendant shall testify truthfully and completely at all times, whether under oath or not, to the crimes mentioned in this agreement. This shall include all interviews, depositions, hearings and trials. Should the defendant refuse to testify or should he at any time testify untruthfully or if any material fact in the defendant's transcribed statements given to the State prior to this agreement be false, then this entire agreement is null and void and the original charge will be automatically reinstated. The defendant will be subject to the charge of Open Murder, and if found guilty of First Degree Murder, to the penalty of death or life imprisonment requiring mandatory twenty-five years actual incarceration, and the State shall be free to file any charges, not yet filed as of the date of this agreement.

4. Adamson signed the following acknowledgement: "I John Harvey Adamson, have read this agreement with the assistance of counsel, understand its terms, understand the rights I give up by pleading guilty in this matter, and agree to be bound according to the provisions herein." Adamson's three attorneys signed the following acknowledgement: "We have discussed this case and the plea agreement with the defendant. We have advised him of his rights and the consequences of his plea, and we concur in his entry of this plea." The state prosecutors signed the following acknowledgement: "We have reviewed this agreement and agree on behalf of the State of Arizona that the terms and conditions set forth herein are appropriate and are in the interests of justice."

On January 19, 1977, Judge Birdsall after having reviewed the presentencing report found that the provisions contained in the plea agreement regarding the sentence to be imposed upon Adamson were appropriate and that Adamson should be sentenced *strictly in accordance with the provisions contained in the plea agreement.* The sentencing date was to be subject to call, and the court set a review hearing in the matter for January 18, 1978, one year from the date of the hearing. All of the jurors were permanently excused and the case was recessed.

It is evident from a review of the record and of the entire plea agreement and exhibits that the purpose of the plea bargaining was for Adamson, with advice of counsel, to waive any rights he may have had at the time the plea agreement was entered into and to proceed in accordance with the terms of the agreement. He knowingly relinquished and abandoned his right to proceed with the open murder trial subject to the condition that if the agreement was breached and became null and void that the parties would be returned to the positions they were in before the agreement. If Adamson breached the agreement, he could again be subject to a first degree murder charge, but he would also reacquire the defenses he had waived, especially as to the incriminating statements he had given as part of the agreement. Adamson does not question the legal sufficiency of his counsel's advise regarding the legal rights he waived under this agreement. It is clear from the record that Adamson, with the aid of his attorneys, knowingly and willingly waived any defense to being subjected again to a first degree murder charge (double jeopardy). Adamson accepted the integrated terms and operation of the plea agreement in exchange for the situation he found himself in at the time the agreement was entered into.

We now must analyze what Adamson received under the plea agreement and what the other parties to the agreement expected and to what they were entitled.

At the time the plea agreement was entered into, Adamson was on trial under an open murder charge for the killing of Donald Bolles. In addition, the state could have prosecuted Adamson for the crimes listed in Exhibits A and B to the plea agreement, crimes in which Adamson's involvement was then known to the police and subject to police reports, and crimes which Adamson had revealed to the state in transcribed statements. Also there were charges in other cases pending against Adamson and other defendants in the Maricopa County Superior Court. The state had the power to try Adamson for each of those crimes, and society and the victims of all those crimes had a legitimate expectation and an interest that the state would prosecute those crimes. The state surrendered that power, and society and the victims through the state gave up their expectations and interests in exchange for Adamson's plea of guilty to the charge of murder in the second degree for the murder of Donald Bolles, and further for Adamson's *promise* that he would testify fully and completely as required by the plea agreement. As a result of entering into the plea agreement, not only did Adamson eliminate the possibility of being found guilty of murder in the first degree in the pending trial, but he also obtained the state's agreement not to prosecute him for the crimes listed in Exhibits A and B and in paragraph 6 of the plea agreement. The many serious actions and charges against Adamson which could have resulted in a death penalty or imprisonment for the rest of his life were dismissed with prejudice. Adamson bargained for, and received as a result of the second degree murder guilty plea, a sentence no longer than twenty calendar years and two months. Adamson obtained federal immunity from prosecution and was allowed to serve his sentence in a prison outside of the State of Arizona. In turn all that was required of Adamson was his truthful and complete testimony concerning crimes in which he admitted he was involved, and as to which he was obtaining immunity and freedom of prosecution.

To protect the rights of the state in the plea agreement, and to insure the value of Adamson's *promise* to testify, paragraph 5 of the plea agreement provided that, in the event he failed to testify or defaulted in the terms of the plea agreement, the plea agreement would become null and void and that all original charges would be reinstated.

To insure the mutual benefit and validity to the plea agreement justifying the removal of Adamson from the threat of the pending trial and all future charges and trials, Adamson waived the rights that would have precluded his being charged again and tried for open murder as a part of the mutuality of waiver of rights and powers that all parties agreed to in the plea agreement. The plea agreement redefined the rights and powers of the parties in an integrated contract. By entering into the plea agreement the parties waived any constitutional rights they may have had and substituted therefor the contractual terms and remedies. Any other interpretation renders the plea agreement ineffectual and unenforceable from the inception.

4. *Adamson's First Degree Murder Conviction is the Consequence of his Voluntary Choice and is Not Invalidated by the Double Jeopardy Clause.*

The majority correctly notes that valid waiver of a constitutional right ordinarily requires that there be an "intentional relinquishment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The majority errs, however, in its implicit and fundamental premise that only a waiver could remove the double jeopardy bar to Adamson's retrial. The foregoing review of exceptions to the double jeopardy bar should dispel the notion that waiver is an invariable prerequisite to a valid second trial where jeopardy has once attached. Indeed, *Jeffers v. United States,* 432 U.S. 137, 152, 97 S.Ct. 2207, 2217, 53 L.Ed.2d 168 (1977), turned on this very point, and, I believe, disposes entirely of Adamson's double jeopardy claim.

In *Jeffers,* as in *Adamson,* the two prosecutions were for a greater and lesser included offense. The defendant in *Jeffers* sought to have the greater and lesser included offenses tried separately. The Court concluded that the defendant's role in bringing about the successive trials removed any constitutional barrier to the second prosecution. *Id.*

This essentially is Adamson's case. Jeopardy attached upon Adamson's entry of a guilty plea. *See United States v. Vaughan,* 715 F.2d 1373, 1376 (9th Cir. 1983). By entering into the plea agreement, Adamson elected the lesser included offense—second degree murder. The only difference from *Jeffers* is that there, a second prosecution on the greater offense was a certainty; for Adamson it was contingent upon his breach of the plea agreement. But this distinction is without constitutional significance, and in any event would seem to weigh in favor of the state in the case before us.

The *Jeffers* Court noted that "the considerations relating to the propriety of a second trial obviously would be much different if any action by the Government contributed to the separate prosecutions on the lesser and greater charges." 432 U.S. at 152 n. 2, 97 S.Ct. at 2217 n. 2. In other words, a different result might have been required had the government acted unilaterally to separate the trials, or if the defendant's voluntariness was compromised or otherwise at issue. Adamson does not seriously contest his voluntariness in entering into the plea agreement, and the state can hardly be held accountable for Adamson's admitted refusal to be interviewed in preparation to testify—the triggering event which, after all, set into motion the second prosecution. Adamson must accept responsibility for the second prosecution; the double jeopardy clause "does not relieve a defendant from the consequences of his voluntary choice." *United States v. Scott,* 437 U.S. 82, 99, 98 S.Ct. 2187, 2198, 57 L.Ed.2d 65 (1978).

The state's freedom from blame in the events leading to Adamson's retrial distin-

guishes this case from *Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975), and *Launius v. United States*, 575 F.2d 770 (9th Cir.1978). In *Menna*, the defendant was charged with an offense for which he had already served a sentence. Thus, the charge was one the state constitutionally could not prosecute. 432 U.S. at 62 n. 2, 96 S.Ct. at 242 n. 2. The state had acted to place the defendant in double jeopardy; accordingly, the defendant's plea of guilty, which removed only the issue of factual guilt from the case, did not impair the defendant's legitimate double jeopardy defense. *Id.*

Similarly, in *Launius*, defendants pleaded guilty to a multiplicious information, and received consecutive sentences on two counts, exceeding the statutory maximum for the single offense charged. 575 F.2d at 771. The government was responsible for initiating proceedings in violation of the double jeopardy clause. The defendants' guilty pleas did not waive their double jeopardy rights. *Id.* at 772. In both these cases the double jeopardy violation was directly attributable to the government in the first instance.

Adamson, however, did not plead guilty to an indictment brought in violation of the double jeopardy clause. By the same token, the state did not attempt to redeem an otherwise invalid prosecution by bargaining for his guilty plea. The second prosecution sprung from the terms of the plea agreement itself. Adamson voluntarily agreed to those terms, precipitated his second prosecution, and should not now be heard to complain of the result.

Whether Adamson's actions are viewed as a waiver or as a voluntary choice, his double jeopardy claims fail.

5. *Adamson Knowingly and Intentionally Breached the Plea Agreement.*

There should be little doubt that Adamson breached his obligation when he expressly refused to provide interviews in preparation for his testimony in the retrial of Robison and Dunlap. The purpose of the plea agreement was to obtain Adamson's testimony concerning certain crimes listed in the agreement and in Exhibits A and B and specifically with regard to the Robison and Dunlap trials, the defendants therein being charged with the murder of Donald Bolles. Unless Adamson's testimony as required by the plea agreement was obtained for the state there is no purpose for the plea agreement and for relieving Adamson of the charges and prosecutions listed in the plea agreement. The agreement at paragraph 5 required Adamson to testify truthfully and completely *at all times*, whether under oath or not, to the crimes mentioned in the plea agreement, including all *interviews*, depositions, hearings and trials. In paragraph 4 of the plea agreement Adamson agreed to testify fully and completely *when requested* by proper authorities. By his April 3, 1980, letter through his attorney, Adamson refused to provide requested pretrial interviews, in plain breach of his obligation.

I cannot agree with the majority's view that Adamson was merely advancing a reasonable interpretation of the plea agreement. The majority points to Paragraph 8, which states that Adamson would be sentenced "at the conclusion of his testimony in all of the cases," as the only unambiguous language in the plea agreement regarding the point at which Adamson's obligation to testify would terminate. This language cannot be interpreted out of context and does not bear the construction the majority places upon it. It does not support the view that, by sentencing Adamson, the state relieved him of his duty to testify. The totality of the plea agreement suggests, and common sense demands, that Adamson was required to testify in the Dunlap and Robison trials whenever called upon to do so.

Paragraph 8 of the plea agreement provides "All parties to this agreement hereby waive the time for sentencing and agree that the defendant will be sentenced at the conclusion of his testimony in all of the cases referred to in this agreement and in *Exhibits A and B*, which accompany it." (Emphasis added). Adamson argues that because he was sentenced before the re-

trial of the state's cases against James Robison and Max Dunlap he had no obligation under the plea agreement to testify at the retrial of those two cases. Adamson is incorrect in his contention and the record contains substantial evidence clearly supporting the conclusion that he knowingly and intentionally breached the plea agreement.

Adamson's attorney, William H. Feldhacker,[5] wrote a letter to the Assistant Attorney General on April 3, 1980, (Appendix B to the majority opinion) stating that he and his law partner had met with John Adamson, and that after lengthy discussions and considerations of all the various aspects of the case and potential ramifications to Mr. Adamson, he was advising the Attorney General of the following matters contained in the letter. The letter stated, *"John Harvey Adamson believes* that he has fully complied with and completed his plea agreement entered into with the State of Arizona. It is, therefore, *his* position that his future testimony in any case involving the defendants Max Dunlap or James Robison regarding the killing of Donald Bolles will only be given upon the offer of *further consideration* by the State of Arizona." (Emphasis added).

The reason for the letter is apparent from its first paragraph wherein it confirmed telephone discussions between the state attorneys and Adamson's attorneys as to the availability of Adamson for interviews in preparation for his expected testimony in the retrials of the State of Arizona against James Robison and Max Dunlap. Interviews are clearly and explicitly stated as one of Adamson's obligations in the plea agreement. Throughout the letter the wording establishes that the statements are communications from John Adamson through his attorney to the state. "John Harvey Adamson is well aware of the fact that he can be subpoenaed ... by your office to appear as a witness in any criminal matter; however, he is further aware

that the fact that he may be called to the stand does not mean he must testify" (paragraph 2); "John Harvey Adamson is further fully aware of the fact that your office may feel he has not completed his obligations under the plea agreement in CR–93385 and, further, that your office may attempt to withdraw that plea agreement from him" (paragraph 3); "If the State of Arizona desires to have Mr. Adamson testify in any further proceedings against James Robison or Max Dunlap, it is John Adamson's position that the following conditions must be met." (Paragraph 4). And then Adamson listed his demands.

Adamson's attorneys do not render their opinion as to whether Adamson's position is correct or reasonable—only that Adamson had taken a position. The language of the letter is carefully couched in this regard. The second sentence in the last paragraph states that "The plea agreement was drafted in such a manner that it was anticipated to be concluded prior to Mr. Adamson's sentencing." What the plea agreement states is controlling, not what Adamson at the moment of breach alleges was anticipated.

The plea agreement defines the time for sentencing, but it does not set the time for an absolute conclusion of Adamson's duty to testify. Paragraph 18 of plea agreement states that Adamson was to remain in the custody of the Pima County Sheriff from the date of the entry of his plea until the conclusion of his testimony in all of the cases in which Adamson agreed to testify. That paragraph does not limit his duty to testify only to such time that he remains in the custody of the Pima County Sheriff. The plea agreement and the sentence had been accepted by Judge Birdsall and there remained only a ministerial act of a sentencing hearing to complete the imposition of the sentence fixed by the plea agreement. Adamson's change in status with the Pima County Sheriff and the sentencing only changed the place of his incarcera-

---

**5.** One of the same three attorneys that appeared for Adamson at his trial, the change of plea hearing and the sentencing hearing.

tion. That ministerial act of sentencing did not change nor could it change his guilty plea, or the acceptance of a guilty plea by the court, or the terms of the plea agreement including the sentence fixed by the plea agreement. When the plea agreement was finally accepted by the judge he stated "The defendant will be sentenced strictly in accordance with the provisions contained in the plea agreement." [6] The sentencing date was set by Judge Birdsall at that time for January 18, 1978, in accordance with his policy and practice not to leave any criminal case sentencing date on a subject to call basis.

The procedure in paragraph 8 waived the time for sentencing and set a time for sentencing not for setting a conclusion on Adamson's duty to testify or retestify in a retried case. This subject was discussed with Adamson and all attorneys by Judge Birdsall at the change of plea hearing on January 15, 1977. Judge Birdsall apprised Adamson that he was entitled under the Arizona Rules of Criminal Procedure to be sentenced within ninety days from the acceptance of his plea agreement and that pursuant to the agreement he was waiving the time for sentencing.

The record establishes that Adamson's continuing obligation to testify, before and after sentencing, was known and understood by Adamson and his attorneys. This is clearly set forth in the dialogue at the December 7, 1978, sentencing hearing before Judge Birdsall in Case No. CR–93385. Adamson and his attorneys, Gregory H. Martin and William H. Feldhacker, were present, together with the Assistant Attorney General William J. Schafer III. As the court was proceeding with the sentencing in accordance with the plea agreement, the following was said:

> THE COURT: All right. The court's *sentencing is limited by the terms of the plea agreement which was entered in this case*, which was previously accepted by the Court and the Court is going to proceed with the sentencing in accordance *with that plea agreement.* Do you have anything Mr. Schafer?
>
> MR. SCHAFER: Yes, I would like to add one thing. I wish the record would show that it has been discussed with counsel, and I believe counsel has discussed it with Mr. Adamson that it may be necessary in the future to bring Mr. Adamson back *after sentencing for further testimony.*
>
> THE COURT: The record may show that.
>
> MR. FELDHACKER: That's our understanding.
>
> MR. MARTIN: That's correct."

Transcript at page 43. (Emphasis added).

Adamson was then sentenced.

It is Adamson's position at this time that his former attorneys have sworn that the "further testimony" involved a wholly separate case than the Bolles murder case, and arising out of the arson of the *Ashford Plumbing Company* in Phoenix, Arizona. *See* page 3 n. 2 Appellant's Supplemental Brief on Rehearing En Banc. In fact, that "further testimony" is testimony contemplated by and included specifically in the plea agreement, the *Ashford Plumbing Company* case being one of the cases listed in Exhibits A and B to the plea agreement. Adamson's counsel, William Feldhacker, in his argument of Adamson's petition for special action before the Arizona Supreme Court on May 28, 1980, appeared with Adamson's other former attorney, Glen Martin. Mr. Feldhacker stated to the court his explanation of the colloquy between counsel at the sentencing hearing before Judge Birdsall regarding the "further testimony." He told the Arizona Supreme Court that at the time of sentencing there was one case left which required Adamson's testimony, and it was from Exhibits A and B appended to the plea agreement, *State of Arizona versus Ashford*. He admitted to a conversation with Mr. Schafer discussing the *Ashford* case, in

---

6. Case No. CR–93385, *State of Arizona v. John Harvey Adamson,* January 19, 1977 Transcript, Wednesday, 10:00 a.m., before Judge Birdsall, page 37, lines 13–15.

which he agreed that, if necessary Adamson may have to testify in that case.[7]

It is obvious that testimony after sentencing was contemplated by the clear language of the plea agreement and understood and intended by the parties. Adamson's anticipated testimony in the *Ashford* case after sentencing was not an addition to or amendment of the plea agreement by the parties, but was one of Adamson's obligations required by the plea agreement, acknowledged by Adamson, Adamson's counsel and the state at Adamson's sentencing hearing on December 7, 1978. Adamson can not assert a reservation for refusal to further testify after sentencing in the *Robison* and *Dunlap* Bolles murder cases, and at the same time acknowledge an obligation to testify in the *Ashford* case after sentencing. The plea agreement makes no such distinctions.

Adamson, in an attempt to take a negotiation advantage as a result of the reversal of the *Robison* and *Dunlap* cases refused to. testify. He attempted to better his position but also took the risk of the refusal to testify. His position at the same time frustrated the state's prosecution of *Robison* and *Dunlap* cases and destroyed the very essence of the plea agreement. Adamson never raised the defense of double jeopardy during the time when he was receiving the benefits guaranteed to him by the plea agreement. However, when the Arizona Supreme Court held that Adamson had breached the plea agreement by refusing to testify, and vacated the second degree murder conviction and sentence and reinstated the open murder charge,[8] Adamson then asserted the position that the plea agreement violated his double jeopardy rights.[9]

---

7. The following conversation took place in the Arizona Supreme Court hearing:

JUSTICE HAYS: Counsel, do you give any weight to that portion of the sentencing where I think Mr. Schafer indicated, Now have it clear for the final acceptance of this plea. We have it clear that Mr. Adamson testified some more—or something to that effect, and, *nobody seemed to object to that position.* I make this response. Was that understood? Does that have any weight, or does it mean—

MR. FELDHACKER: As to the meaning of that, Your Honor—I think that was on December 7, 1978—I believe I have in my notes—I have that there was a discussion of that. I don't think it's as clear as Your Honor stated, but it's clear that it's understood that it happened.

What happened was that we were asked if there was any legal cause for Mr. Adamson not to be sentenced. We certainly stated there was none. Mr. Schafer said, Yes, I would like to add one thing. I wish the record would show that it has been discussed with Counsel, and I believe Counsel has discussed it with Mr. Adamson, that *it may be necessary in the future to bring Mr. Adamson back after sentencing for further evidence.* The record may show that; and I stated, That's our understanding.

Subsequently there was one case left from *exhibits A and B that were appended to that plea agreement, and that case left was State of Arizona versus Ashford.* It's a case that was under under investigation. It's basically—I would submit from my conversation with Mr. Schafer—a case that they concluded they would never be able to actually put together and prosecute. However, Mr. Schafer dis-

cussed it with us—about the Ashford case; about the fact that, you know, *we had that in the agreement; that, if necessary, he may have to testify in that case.*

*Adamson v. Superior Court,* No. 14898, Transcript of Proceedings, May 28, 1980, commencing at page 6, line 21. (Emphasis added).

8. *Adamson v. Superior Court,* 125 Ariz. 579, 583, 584, 611 P.2d 932, 936, 937 (1980).

9. It was at this point that Adamson filed his first Petition for Writ of Habeas Corpus in the district court which was dismissed on September 26, 1980. Adamson then appealed that order to this court claiming that the rejection of his double jeopardy argument by both the Arizona Supreme Court and the district court rested on erroneous interpretations of the plea agreement, and that he was denied due process for failure of the courts to hold a full evidentiary hearing to determine that material facts surrounding the breach of the plea agreement. In unpublished Memorandum No. 80–5941 this court on November 30, 1981 affirmed the district court dismissal of Adamson's habeas corpus petition, and upheld the Arizona Supreme Court and federal district court interpretation that Adamson had breached the plea agreement by refusing to testify, and that the plea agreement did not contemplate renegotiation in the event of a retrial. This court further held that Adamson's double jeopardy rights had not been violated, and that due process did not require an evidentiary hearing. *Adamson v. Hill,* 667 F.2d 1030 (9th Cir., 1981) *see* page 5 n. 4. The United States Supreme Court denied certiorari on March 1, 1982, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853.

In fact, those rights were waived when he entered into the plea agreement, and the reinstatement of the first degree murder charge was the consequence of his voluntary choice and excepted from the double jeopardy defense, as fully discussed *supra.*

In order to escape a possible first degree murder conviction in the trial which was pending at the time of the plea agreement, Adamson accepted all the benefits the state was willing to give for his testimony. Then when faced with further testimony in the *Robison* and *Dunlap* cases he attempted to compound his benefits, with further detriment to the state, for the "additional testimony" which was in fact fully contemplated by the plea agreement. The plea agreement and the statements Adamson gave in connection with the plea agreement ostensibly set forth all of the crimes which he was willing to reveal and obtain dismissal and immunity for. However, in paragraph 4(f) of his demand letter of April 3, 1980, Adamson demands further immunity for *any and all crimes* in which he may have been involved. This is a request for more protection when the state is still only trying to obtain what it had originally had bargained for; testimony with regard to the Donald Bolles murder and the other crimes listed in the plea agreement.

After Adamson proceeded in breach of the agreement, the sequence of events that followed was entirely predictable; indeed, the outcome was specified by the plea agreement. Because the results of Adamson's breach were fully contemplated and determined by the plea agreement, it should be upheld by this court.

### 6. *Prosecutorial Vindictiveness.*

I would also reject Adamson's claim that his second conviction violates due process because it is the product of prosecutorial vindictiveness.

In advancing this claim, Adamson relies primarily on the Supreme Court's decision in *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). The Court in *Blackledge* held that due process forbids a prosecutor from bringing increased charges in retaliation to a defendant's exercise of a constitutional right. *Id.* at 27–28, 94 S.Ct. at 2102–03. The prohibition against prosecutorial vindictiveness does not require evidence that retaliatory motivation actually existed; rather, it is to the appearance of vindictiveness that the prohibition is directed. The underlying policy is to insure that apprehension of retaliation does not deter a defendant's exercise of the right to appeal or to collaterally attack a first conviction. *Id.* at 28, 94 S.Ct. at 2102–03.

The problem for Adamson is that he can point to no exercise of a constitutional right that precipitated his second prosecution on an increased charge. Indeed, the retrial came about because of his breach of a plea agreement. Because there had been no exercise of a constitutional right, the *Blackledge* "presumption of vindictiveness," and the policy underlying it, does not apply.

Although Adamson invoked his fifth amendment rights when he refused to testify at a pretrial hearing in the Dunlap and Robison retrials, this exercise of a constitutional right was wholly unconnected to his reprosecution. Adamson had acted in breach of the agreement by his letter of April 3, 1980. The state, by its letter of April 9, 1980, had already indicated that it considered that Adamson had breached the agreement, and his breach permitted reinstatement of the original charges and Adamson's original defenses.

The prosecutor's freedom to seek increased charges is vital to the integrity of the plea bargaining process, and is well supported by case law. The Supreme Court in *Bordenkircher v. Hayes,* 434 U.S. 357, 364–65, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978), held that a prosecutor properly could use the threat of increased charges to secure a plea agreement. This is exactly what happened in Adamson's case. The prospect of a first degree murder charge induced Adamson to plead guilty to second degree murder and to promise to testify against Robison and Dunlap and as further specified in the plea

agreement. The agreement provided for reinstatement of the first degree murder charge in the event of breach.

It is totally unreasonable and senseless to suggest that the prosecutor could fairly strike a bargain with a first degree murder reinstatement provision, but that prohibitions against prosecutorial vindictiveness prevent his carrying it out.

The evidence supported the first degree murder charge against Adamson, and society and the victims had a legitimate interest in seeing that charge filed and pursued. In view of the especially savage Bolles murder contract it would have been amazing if the prosecutor had filed anything else. There is no vindictiveness evident in the prosecutor's intent to retry Adamson. The intent to retry arose long before Adamson refused to testify as it was included in the paragraph 5, reinstatement provision of the plea agreement. Allowing Adamson to decide whether or not he should breach the plea agreement or to challenge it constitutionally, and once having lost the challenge to again volunteer to perform the plea agreement makes the reinstatement clause totally illusory. This gives Adamson the unilateral right to defeat the substance and value of the plea agreement. The threat of the death penalty against Adamson was necessary to insure performance of Adamson's *promise* that he would testify in accordance with the plea agreement. In any trial or retrial once the trial court swears and seats the jury and the trial proceeds double jeopardy attaches as to that specific defendant. *Crist v. Bretz*, 437 U.S. 28, 29, 98 S.Ct. 2156, 2157–58, 57 L.Ed.2d 24 (1978). If at that point Adamson takes the stand and asserts the Fifth Amendment, which he had the power (not the right) to do under the plea agreement, then the *Dunlap* or *Robison* cases or any other case in which he was to testify cannot be prosecuted. Adamson in fact did that and caused that exact result with his breach letter of April 3, 1980. In fact, in paragraph 2 of his letter he evidenced his threat that he could not be made to testify. At that point a contempt citation did not bother Adamson.

The heart of the plea agreement is the default clauses, paragraphs 3, 5, 11 and 15, containing the reinstatement of open murder charges to prevent Adamson from unilaterally defeating the agreement. Adamson's testimony and credibility were crucial to the conviction of Dunlap and Robison. *See State v. Robison*, 125 Ariz. 107, 608 P.2d 44, 45 (1980). Adamson's unilateral nonnegotiable demands for his testimony in the retrials destroyed his credibility and the state acted without vindictiveness and appropriately under the agreement to reinstate the open murder charges.

7. *The Improper Reinstatement of the Second Degree Murder Conviction and Sentence.*

The majority erroneously reads Paragraph 5 in isolation and concludes that under its provisions Adamson's breach would result only in voiding the executory agreement but would have no effect on the second degree murder judgment of conviction and sentence. To the contrary, Paragraph 15, by its very terms applies where the agreement has been voided, and requires that the parties be returned to their positions prior to agreement. Thus the majority's view that the conviction and sentence somehow would survive is refuted by a plain reading of the agreement itself. To leave Adamson with a second degree murder conviction based on his guilty plea, and with a sentence meted out precisely according to the terms of the agreement, would hardly return him to his position before the agreement.

Adamson cannot again be tried for first degree murder, the plea agreement has been made unenforceable and worthless by the majority opinion, and the parties are left with the scattered remains of all the proceedings which have transpired.

Reinstatement of the second degree murder judgment and sentence is not before this court. The majority, however, having freed Adamson from the death penalty, attempts to prevent his release by imposing upon the Arizona Supreme Court the burden of *reinstating* the second degree mur-

der conviction within six months. If for any reason the Arizona Supreme Court fails to reinstate the conviction within the six months, Adamson, who has admitted to the involvement in and commission of the crimes set forth in the plea agreement, will go free. Adamson's status may be in question if the Arizona Supreme Court is unable to reinstate the conviction until after six months. The Arizona Supreme Court's burden is further enhanced by the spectre of another double jeopardy attack based upon the reasoning of the majority opinion. I respectfully submit that the plea agreement was negotiated by the parties to avoid the complications and convolutions brought on by the majority's misinterpretation of the plea agreement, all as set forth in this dissent.

I would affirm the district court's denial of Adamson's petition for writ of habeas corpus.

KENNEDY, Circuit Judge, dissenting:

I concur in general in the dissent by Judge Brunetti and find compelling his demonstration that this defendant so well understood the mechanics of the plea bargain and the risks consequent from breach that the majority's requirement of double jeopardy waiver is pointless. With all respect, I submit the majority's analysis rests on other explicit and implicit assumptions that are quite contrary to settled principles of double jeopardy law. I dissent separately to make clear the full extent of my disagreement with the analysis apparently adopted by a majority of the court.

As I explain further below, the principal error of the majority is its assumption that a conviction resting on a plea agreement protects the defendant against trial for a higher offense if the plea or the conviction on which it stands is properly set aside. I submit this is incorrect. The extent of double jeopardy protection when a guilty plea and conviction are set aside requires an inquiry into the grounds upon which they were set aside. If the conviction here could not stand by reason of a breach of the plea agreement, the defendant could be tried on the same charge or on a higher one, for the conviction rested on the plea alone, not a trial, and the plea was set aside by reason of the defendant's own default, not by the mere fiat of the state. The majority's first false premise is that there was a double jeopardy right to be waived; there was not. The second false premise is that express waiver was required; it was not. The third false premise is that the contract was not a waiver in itself; it was. I turn to a more detailed discussion of these matters.

To begin with, jeopardy may attach upon the entry of a guilty plea. "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969). Guilty pleas are entered under such a variety of circumstances that a general rule is not easily stated, but I should think that when a plea of guilty is accepted on the record and nothing remains but to pass sentence and enter the conviction, jeopardy attaches upon entry of the plea. *United States v. Cruz*, 709 F.2d 111, 112, 115 (1st Cir.1983) (holding jeopardy attached upon acceptance of the plea). Despite the majority's statement to the contrary, there were no conditions attendant upon acceptance of this plea, other than the terms of the written plea bargain itself. I would conclude that jeopardy attached upon entry of the plea. With this principle in mind, a major defect of the majority opinion becomes apparent. By the majority's reasoning, Adamson could have renounced the agreement a week after it was made and, as it holds double jeopardy had not been waived, he would have the same incredible immunity from the agreement's enforcement mechanism as the majority grants him because the conviction and sentence were entered.

The question becomes what jeopardy protection remained after the plea and conviction were set aside. The quality and degree of jeopardy protection derived from a

conviction based on a voluntary plea must be confronted by the majority. When the plea or conviction based upon it is set aside and further proceedings commence, the authorities do not support the premise that prosecution for a greater offense is necessarily prohibited. Where a conviction is set aside, the protections of the double jeopardy clause are only in proportion to, not greater than, the risks assumed by the defendant in the former proceeding. As the plea does not put a defendant at risk of a determination of guilt for a higher offense, a charge for the higher offense may be reinstated when and if the plea or its consequent conviction are set aside, absent, say, a circumstance in which the state somehow is entitled to set aside the plea but acts unilaterally and without cause to impose greater burdens on the defendant.

In *United States v. Barker*, 681 F.2d 589 (9th Cir.1982), the defendant agreed to plead guilty to second degree murder. She successfully had the conviction set aside on a section 2255 motion, on the ground that she had not been adequately informed of the nature of the second degree murder charge. *Id.* at 590. Her retrial for first degree murder was held not barred by double jeopardy, because the court's acceptance of the plea to second degree murder did not constitute an implied acquittal of first degree murder. *Id.* at 590–92. As Judge Hug noted in his opinion for the court in *Barker*, the precedents are in full accord. *Klobuchir v. Pennsylvania*, 639 F.2d 966 (3d Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 474 (1981) (where conviction of third degree murder set aside, double jeopardy did not bar trial for murder in the first degree, as the prior conviction rested on a plea, not a trial); *Hawk v. Berkemer*, 610 F.2d 445 (6th Cir. 1979) (after guilty plea and conviction of murder and dismissal of aggravated murder charge in state court, defendant's appeal in effect withdrew the plea and the original, more serious charge can be reinstated). The rule of *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), is simply not controlling, though the majority assumes its applicability without discussion. That case discusses double jeopardy protections which stem from a plea and a conviction that remain in force, not a plea and conviction that are set aside. Here the state ordered the conviction vacated under terms agreed upon by the defendant, and so acted on a clean slate. In *Brown* the prosecution attempted to proceed when the conviction on a lesser charge remained in force and unimpeached. Though I reject the fanciful notion that the rule of double jeopardy gives any help at all to the defendant in the face of the express terms of this plea bargain, even if those rules do apply, they do not support the result the majority reaches. The plain fact is there was no double jeopardy protection to waive if the plea and conviction were to be set aside by the defendant's own acts of default. Adamson not having undergone a trial on the merits and not having established innocence to the charge of murder in the first degree, the trial could and did proceed on the greater charges without offending constitutional principles.

We may turn next to examination of the waiver rules the majority applies to the case. Here too the court departs from controlling authority. Jeopardy is waived in a number of instances by the defendant's own actions, and no express waiver or admonition is required before the court finds the waiver to have taken place. If a defendant moves for mistrial and obtains it, jeopardy is waived though he was not forewarned of such a consequence. *United States v. Dinitz*, 424 U.S. 600, 609 n. 11, 96 S.Ct. 1075, 1080–81 n. 11, 47 L.Ed.2d 267 (1976). This same result occurs where a guilty plea is withdrawn or the conviction based upon it is set aside by reason of the defendant's action. *See United States v. Barker*, 681 F.2d 589 (9th Cir.1982) (defendant appeals plea-based conviction). The state can retry the defendant, and the authorities contain no requirement that he be forewarned of such a result. *See, e.g., United States v. Jerry*, 487 F.2d 600, 606 (3d Cir.1973) ("where a defendant by his own motion causes the withdrawal of his

guilty plea, he has waived his right not to be put in jeopardy a second time"). In the case before us, of course, the defendant was forewarned of the consequences attendant upon breach of the plea agreement. The agreement specifically set forth that the defendant could be retried for murder in the first degree if a breach of the agreement caused the conviction to be set aside, which, as I have demonstrated, is the law in any event.

The majority seems to proceed on the assumption that jeopardy did not attach until the sentencing hearing, and on the further assumption that the record was somehow confused by the colloquy respecting defendant's obligation to give further testimony. As I have indicated, jeopardy attached much earlier, upon acceptance of the plea; and, in any event, the protections of the double jeopardy clause do not extend where the defendant did not face a trial and a plea-based conviction is properly set aside. Beyond this, waiver is not required in any event. Prosecutors do not have to explain the mysteries of double jeopardy before entering into an enforceable plea agreement. The whole purpose of such agreements, as in this case, is to permit the defendant to plead to lesser charges subject to the risk of facing more serious ones if he does not keep his end of the deal. For the court, deus ex machina, to drop the idea of double jeopardy and waiver into the plea bargain context is inconsistent with any reasonable interpretation of the contract made between the defendant and the state. The contract makes no sense if by some legal theory it is contended defendant did not accept it with full knowledge and understanding of its enforcement terms. The defendant well knew that he could not be required to accept the enforcement terms of the plea agreement, and in this context the failure to advise him of his double jeopardy rights is quite beside the point. Indeed, if the phrase "double jeopardy" had been added to the litany of rights the defendant was asked to waive in the plea agreement, competent defense counsel most surely would have objected to it. For in truth the defendant was not

waiving double jeopardy. Its protections would not apply in the event of the breach; and if the second degree conviction remained in force, the defendant was entitled to the protections of the double jeopardy clause. Had the conviction remained in force, there could have been no trial for newly discovered evidence, no new sentencing procedure, or no further trial to impose heavier burdens upon him. Any general waiver of double jeopardy simply would have confused the record.

I recognize that the state has raised certain questions by having entered the second degree conviction before the terms of the bargain were fulfilled, but whether that was in violation of the agreement or somehow excused the defendant's further performance is simply a state law issue, not a double jeopardy question. The critical issue in the case becomes whether the defendant's acts were in breach of the agreement. That issue is one of state law, nothing more. Its outcome depends on primary and historical facts, which we have no authority to determine. *See Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980). Even if we did have authority to scan the state's finding that there was a breach of the agreement, there is ample support for it. The defendant agreed that the first degree charges could be reinstated for a breach, and nothing in the later proceedings changed that compact. When the defendant first gave the state notice of his refusal to cooperate further, his own attorneys specifically noted the possibility that the state would interpret noncooperation as a breach. The defendant took a risk not without some attractions for him. He was serving a twenty-year sentence. If the state elected to try him for first degree murder, conceivably he might have won an acquittal. It is hardly surprising that one as depraved as Adamson would shrink from a breach of contract and a gamble on the results. The court errs in not recognizing his defiance for what it is.

Finally, the court papers over the consequences of its ruling by telling Arizona it

need not set Adamson free if it can find some way to reinstate the second degree murder conviction. We cannot, of course, by our own authority order that conviction reinstated. The matter has not been argued to us, but it may be that under Arizona law reinstatement is not permitted. Given our erroneous double jeopardy ruling, there can be no retrial for first degree murder; given the Arizona court's final determination that the plea bargain was breached and its ruling that the second degree murder conviction should be vacated, it is not clear to me that as a matter of state law it can turn around and change its decision to accommodate our error. Though I intimate no views as to the outcome under Arizona law, it is not beyond possibility that as a result of our decision the defendant will walk free.

In the context of the plea bargain before us, the double jeopardy analysis of the court is artificial. It gives the defendant a windfall of the kind that results when a court imposes a constitutional interpretation of new dimensions in what should have been a simple case of the making of a bargain and the failure to keep it. I dissent.